Kerry S. Culpepper
Hawaii Bar No. 9837
kculpepper@culpepperip.com
CULPEPPER IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawai'i 96740
Telephone:  (808) 464-4047
Facsimile:   (202) 204-5181
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| MILLENNIUM FUNDING, INC., HUNTER KILLER PRODUCTIONS, INC. and VOLTAGE HOLDINGS, LLC, | Case No.:  2:21-cv-10490 |
| Plaintiffs, | **(1) DIRECT COPYRIGHT INFRINGEMENT; (2) CONTRIBUTORY COPYRIGHT INFRINGEMENT, (3) DMCA VIOLATIONS; (4) INJUNCTIVE RELIEF PURSUANT TO 17 U.S.C. §512(j)** |
| v. | |
| SMR HOSTING LLC, DAVID COX, and DOES 1-100, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## COMPLAINT

MILLENNIUM FUNDING, INC., HUNTER KILLER PRODUCTIONS, INC., and VOLTAGE HOLDINGS, LLC ("Plaintiffs"), by and through their counsel, bring this Complaint against SMR HOSTING LLC, DAVID COX and DOES 1-100 ("Defendants") and allege as follows:

## I.   NATURE OF THE ACTION

1.     Plaintiffs brings this action under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, et seq. (the "Copyright Act") and allege that Defendants SMR HOSTING LLC and DAVID COX are secondarily liable (under material contribution, intentional inducement and vicarious infringement) for their customers direct infringements in violation of 17 U.S.C. §§ 106 and 501, liable for injunctive relief pursuant to 17 U.S.C. §§ 512(j), and secondarily liable for their customers violations under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202.

2.     Plaintiffs further allege that Defendants DOES 1-100 are liable for direct and contributory copyright infringement and DMCA violations.

## II.     JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, et. seq., (the Copyright Act), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338 (patents, copyrights, trademarks, and unfair competition) and 28 U.S.C. § 1367 (supplemental jurisdiction).

4.     Defendants solicit, transact, or are doing business within this jurisdiction, and have committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that their acts would cause injury in this jurisdiction.

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) - (c)

20-023DBa

because: (a) all or a substantial part of the events or omissions giving rise to the claims occurred in this District; (b) the Defendants reside or resided, and therefore can or could be found, in this District; and/or (c) Defendants are subject to the court's personal jurisdiction with respect to the present action.  Additionally, venue is proper in this District pursuant 28 U.S.C. § 1400(a) (venue for copyright cases), because the Defendants or Defendants' agents resides and/or can be found in this District.

6.      Defendants SMR HOSTING LLC and DAVID COX reside in this District.

7.      Upon information and belief, Defendants SMR HOSTING LLC, DAVID COX, and 1701 MANAGEMENT, LLC sell or have sold Virtual Private Network ("VPN") service to individuals residing in Michigan and this District under the name LiquidVPN (the "LiquidVPN service").

8.      Defendants DOES 1-100 entered into subscription agreements with Defendants SMR HOSTING LLC and DAVID COX for LiquidVPN service and thus entered into an agreement with a company in this District.  By the nature of the LiquidVPN service which anonymizes the Internet Protocol ("IP") address of the user, Plaintiffs are unable to ascertain the residency of Defendants DOES 1-100.

### III.    PARTIES

#### A.   The Plaintiffs

9.      MILLENNIUM FUNDING, INC. ("Millennium") is a corporation

organized and existing under the laws of the State of Nevada and having a principal office in Los Angeles, California.

10.     Millennium is the owner of the copyrights for the screenplay and motion picture in the movie "*Automata*" ("First Work") a major motion picture released in 2014.  The First Work is a science fiction film starring Antonio Banderas, Dylan McDermott and Melanie Griffith.  The First Work tells the story of a post-apocalyptic Earth decimated by climate change where the remaining humans living in a network of safe cities with the assistance of humanoid robots.  An insurance investigator for the manufacturer of the robots must investigate whether the robots have failed to obey protocols programmed into them to protect humans.

11.     Millennium is also the owner of the copyrights for the screenplay and motion picture in the Work "*Survivor*" ("Second Work"), a major motion picture released in 2015.  The Second Work is an action film starring Milla Jovovich, Pierce Brosnan and Dylan McDermott.   The Second Work tells the story of a State Department employee entrusted in stopping terrorist attacks that is forced to flee when she is framed for a crime.

12.     HUNTER KILLER PRODUCTIONS, INC. ("Hunter Killer") is a corporation organized and existing under the laws of the State of Nevada and having a principal office in Los Angeles, California.

13.     Hunter Killer is the owner of the copyrights for the screenplay and

20-023DBa

motion picture in the Work "*Hunter Killer*" ("Third Work") a major motion picture released in 2018.  The Third Work is an action movie starring Gerard Butler, Gary Oldman, Common, and Linda Cardellini.  The Third Work tells the story of American submarine Captain Joe Glass on the hunt for a U.S. submarine in distress when he discovers a secret Russian coup which threatens to dismantle the world order.

14.     Hunter Killer and Millennium are affiliates Millennium Media, a production company and distributor of a notable catalog of major motion pictures.

15.     VOLTAGE HOLDINGS, LLC ("Voltage") is a limited liability company organized and existing under the laws of the State of Nevada and having a principal office in Los Angeles, California.

16.     Voltage is the owner of the copyrights for the screenplay and motion picture in the Work "*I Feel Pretty*", ("Fourth Work") a major motion picture released in 2018 and starring Amy Schumer, Michelle Williams and Rory Scovel.  The Fourth Work tells the story of a woman struggling with insecurity who after awakening from a fall believes she is the most beautiful and capable woman on the planet.

17.     Voltage is also the owner of the copyrights for the screenplay and motion picture in the Work "*Shock and Awe*" ("Fifth Work") a major motion picture released in 2017 and starring Woody Harrelson, James Marsden and Rob Reiner.  The Fifth Work tells the story of journalists from the Knight-Ridder news service covering President George W. Bush's planned invasion of Iraq in 2003 who become skeptical

20-023DBa

of the claim that Saddam Hussein has weapons of mass destruction.

18.     Voltage is an affiliate of Voltage Pictures, a production company with a notable catalog of major award-winning motion pictures.

**B. The Defendants**

19.     Defendant SMR HOSTING LLC ("SMR") is a limited liability company organized under the laws of Michigan with its principal place of operations in, upon information and belief, Canton, Michigan (Wayne County).

20.     Upon information and belief, SMR has been in existence since 2013.

21.     Defendant DAVID COX ("Cox") is an adult individual residing in, upon information and belief, Livonia, Michigan (Wayne County).

22.     Upon information and belief, Cox is the owner and sole member of SMR.

23.     Upon information and belief, Cox is the owner and sole shareholder of SMR.

24.     Cox effectively makes all policy decisions for SMR, specifically including any policy regarding copyright infringement. Upon information and belief, Cox directed SMR's response to allegations of copyright infringement occurring on the LiquidVPN service, including the decisions not to terminate repeat copyright infringers, to ignore notices of copyright infringement and to promote the LiquidVPN service for the purposes of copyright infringement.

6

20-023DBa

25.     Upon information and belief, Cox so dominates SMR that it has become merely the alter ego to Cox.

26.     There is such a unity of interest between Cox and SMR that the individuality, or separateness, of Cox and SMR has ceased and the facts are such that an adherence to the fiction of the separate existence of the Cox and SMR would, under the particular circumstances, sanction a fraud or promote injustice.

27.     Cox controls, participates in, exercises control over, or benefits from the infringement of Defendant SMR as discussed below.

28.     Defendant Cox and his alter ego SMR (the "LiquidVPN Defendants") operated a provider of Virtual Private Network ("VPN") services under the name LiquidVPN from, upon information and belief, 2013 until approximately March of 2019.

29.     The LiquidVPN Defendants' LiquidVPN service is for transmitting, routing and/or or providing connections for said transmitting and routing, through a network controlled by the LiquidVPN Defendants ("providing network connections").

30.     A VPN is a type of Internet Service that provides access to the Internet. A conventional Internet Service Provider ("ISP") will assign its subscriber an IP address and log the subscriber's activities on the Internet while using the assigned IP address.   In comparison, many VPN providers provide their subscribers

20-023DBa

"anonymous" usage by, for example, not logging subscriber access, assigning the subscriber IP addresses that are simultaneously shared among many users, and/or encrypting traffic.

31. The LiquidVPN Defendants advertise their LiquidVPN service as providing "Anonymous IP Addresses to Protect … Online Privacy", being used to "Hide Your IP address" and further state that LiquidVPN has "…over two thousand public IP addresses. Imagine getting access to a new IP anytime you use the VPN for Kodi and BitTorrent."



32. The LiquidVPN Defendants advertise the LiquidVPN service as providing three different types of VPN connections: 1) dynamically assigned public IP address in which a public IP address is randomly assigned; 2) a shared VPN tunnel in which encrypted VPN traffic is protected behind a firewall; and 3) Modulating VPN tunnel in which the subscriber's public IP address from which traffic exits is changed on new events that create new connections. *See*

20-023DBa

https://www.liquidvpn.com/supported-vpn-tunnel/ [last accessed on Feb. 23, 2021].

33. The LiquidVPN Defendants recommend the dynamically assigned public IP address for peer-2-peer (P2P) downloading.

34. DOES 1-100 are subscribers of the LiquidVPN service. Each of DOES 1-100 were assigned an IP address from the LiquidVPN service and said IP address to download and reproduce Plaintiffs' Works without a license and further share (distribute) copies of Plaintiffs' Works from said Internet Protocol address to individuals across the world as encouraged and instructed to by the LiquidVPN Defendants.

35. Each of Defendants DOES 1-100 used a piracy website such as Pirate Bay either directly or via a BitTorrent Client such as Popcorn Time to obtain torrent files for downloading and distributing Plaintiffs' Works using an IP address provide by the LiquidVPN Defendants

36. Defendants DOES 1-100 are members of a group of BitTorrent users or peers whose computers are collectively interconnected for the sharing of a particular unique file, otherwise known as a "swarm". The particular file a BitTorrent swarm is associated with has a unique "hash" number and a file name.

37. Plaintiffs are informed and belief that the LiquidVPN Defendants are in possession of identification information or information that will lead to the identities of DOES 1-100 such as payment information. However, further discovery

20-023DBa

may be necessary in some circumstances in order to be certain of the identity of the proper Defendant.  Plaintiff believes that information obtained in discovery will lead to the identification of each Defendants DOES 1-100's true name and permit the Plaintiffs to amend this Complaint to state the same.  Plaintiffs further believe that the information obtained in discovery may lead to the identification of additional infringing parties to be added to this Complaint as defendants.  Plaintiffs will amend this Complaint to include the proper names and capacities when they have been determined.  Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously named Defendants participated in and are responsible for the acts described in this Complaint and damages resulting therefrom.

### C.  Non-parties

38.    1701 MANAGEMENT, LLC ("1701") is a limited liability company organized under the laws of Puerto Rico and having a principal place of operations in San Juan, Puerto Rico.

39.    In February of 2019, the LiquidVPN Defendants entered into an asset purchase agreement with 1701 to sell the assets of LiquidVPN to 1701.

40.     The American Registry of Internet Numbers ("ARIN") is a nonprofit, member-based organization that manages and distributes Internet number resources such as IP addresses and Autonomous System Numbers.

41.    ARIN manages these resources within its service region, which is

20-023DBa

comprised of Canada, the United States, and many Caribbean and North Atlantic islands.

42.     Choopa LLC ("Choopa") is a provider of data centers, dedicated servers and colocation service.  Choopa receives IP addresses from ARIN.

43.     ReliableSite.Net LLC ("Reliable") is a provider of data centers and dedicated servers. Reliable obtains at least some services including IP addresses from Choopa.  Reliable assigned IP addresses to the LiquidVPN Defendants.

44.     HugeServer Networks, LLC ("HugeServer") is also a provider of data centers, dedicated servers and colocation service.  HugeServer also receives IP addresses from ARIN and assigned IP addresses to the LiquidVPN Defendants.

## IV.   JOINDER

45.     Pursuant to Fed. R. Civ. P. 20(a)(1), each of the Plaintiffs are properly joined because, as set forth in detail above and below, the Plaintiffs assert: (a) a right to relief arising out of the same transaction, occurrence, or series or transactions, namely the use of the LiquidVPN service by the LiquidVPN Defendants' subscribers (Defendants DOES 1-100) for infringing the copyrights in Plaintiffs' Works, the contribution to said infringements by the LiquidVPN Defendants, and the promotion of LiquidVPN by the LiquidVPN Defendants for the purpose of infringing copyright protected Works including Plaintiffs; and (b) that there are common questions of law and fact.

20-023DBa

46.    Pursuant to Fed. R. Civ. P. 20(a)(2), each of the Defendants was properly joined because, as set forth in more detail below, the Plaintiffs assert that the infringements complained of herein by each of the Defendants (a) arises out of the same transaction, occurrence, or series of transactions or occurrences, and (b) there are common questions of law and fact.  That is, each of Defendants DOES 1-100 used the LiquidVPN service provided and promoted by the LiquidVPN Defendants to infringe Plaintiffs' copyrights in their Works.

47.    Plaintiffs assert a right of relief against the LiquidVPN Defendants jointly and severally.

## V.    FACTUAL BACKGROUND

### A. The Plaintiffs Own the Copyrights to the Works

48.    The Plaintiffs are the owners of the copyright in the Works, respectively.  The Works are the subjects of copyright registrations, and this action is brought pursuant to 17 U.S.C. § 411.  *See* Exhibit "1".

49.    Each of the Works are motion pictures currently offered for sale in commerce.

50.    Defendants had notice of Plaintiffs' rights through at least the credits indicated in the content of the motion pictures which bore proper copyright notices.

51.    Defendants also had notice of Plaintiffs' rights through general publication and advertising associated with the motion pictures, and packaging and

copies, each of which bore a proper copyright notice.

## B. Defendants DOES 1-100 Used BitTorrent to Infringe the Plaintiffs' Copyrights

52.    BitTorrent is one of the most common peer-to-peer file sharing protocols (in other words, set of computer rules) used for distributing large amounts of data.

53.    The BitTorrent protocol's popularity stems from its ability to distribute a large file without creating a heavy load on the source computer and network. In short, to reduce the load on the source computer, rather than downloading a file from a single source computer (one computer directly connected to another), the BitTorrent protocol allows users to join a "swarm" of host computers to download and upload from each other simultaneously (one computer connected to numerous computers).

### 1. Each of Defendants DOES 1-100 installed a BitTorrent Client onto his or her Computer.

54.    A BitTorrent Client is a software program that implements the BitTorrent Protocol.  There are numerous such software programs which can be directly downloaded from the Internet.

55.    Once installed on a computer, the BitTorrent Client serves as the user's interface during the process of uploading and downloading data using the BitTorrent

protocol.

56.     Defendants DOES 1-100 installed a BitTorrent Client such as "Popcorn Time" onto their respective computers.

57.     Popcorn Time is so notorious for movie piracy that it has been referred to in the news media as "Netflix for pirates". http://fortune.com/2016/02/26/popcorn-time-netflix-pirates/ [accessed on March 1, 2021].

58.     Popcorn Time provides an interface so that users can easily copy and share copies of copyright protected content, including Plaintiffs'.

59.     The home interface of Popcorn Time includes a collection of title art of popular motion pictures and a search bar where a user can enter words associated with a copyright protected motion picture they wish to copy.

60.     Simply entering words associated with a motion picture automatically generates a pull down tab below the search bar with a narrowed selection of motion pictures associated with the words.

### 2. The Initial Seed, Torrent, Hash and Tracker

61.     A BitTorrent user that wants to upload a new file, known as an "initial seeder," starts by creating a "torrent" descriptor file using the Client he or she installed onto his or her computer.

62.     The initial user or seeder of a file used a process referred to as "ripping"

14

to create a copy of motion pictures from either Blu-ray or legal streaming services.

63.    The initial seeder often modifies the file title of the Work to include a wording such as "RARBG", "FGT" or "YTS" in the title of the torrent files and file copies in order to enhance a reputation for the quality of his or her files and attract users to his or her piracy website.

64.    The Client takes the target computer file, the "initial seed," here the copyrighted Work, and divides it into identically sized groups of bits known as "pieces."

65.    The Client then gives each one of the computer file's pieces, in this case, pieces of the copyrighted Work, a random and unique alphanumeric identifier known as a "hash" and records these hash identifiers in the torrent file.

66.    When another peer later receives a particular piece, the hash identifier for that piece is compared to the hash identifier recorded in the torrent file for that piece to test that the piece is error-free. In this way, the hash identifier works like an electronic fingerprint to identify the source and origin of the piece and that the piece is authentic and uncorrupted.

67.    Torrent files also have an "announce" section, which specifies the URL (Uniform Resource Locator) of a "tracker," and an "info" section, containing (suggested) names for the files, their lengths, the piece length used, and the hash identifier for each piece, all of which are used by Clients on peer computers to verify

the integrity of the data they receive.

68.    The "tracker" is a computer or set of computers that a torrent file specifies and to which the torrent file provides peers with the URL address(es).

69.    The tracker computer or computers direct a peer user's computer to other peer user's computers that have particular pieces of the file, here the copyrighted Work, on them and facilitates the exchange of data among the computers.

70.    Depending on the BitTorrent Client, a tracker can either be a dedicated computer (centralized tracking) or each peer can act as a tracker (decentralized tracking.)

### 3. Torrent Sites

71.    "Torrent sites" are websites that index torrent files that are currently being made available for copying and distribution by people using the BitTorrent protocol.  There are numerous torrent websites such as The Pirate Bay, Kickass Torrents and Extratorrents.

72.    The Pirate Bay torrent site is so notorious that the United States Trade Representative ("USTR") placed it on a list of examples of Notorious Markets engaged in and facilitating substantial piracy. *See* USTR, 2018 Out-of-Cycle Review of   Notorious   Markets,   April   2019,   pgs.   27-28,   Available   at https://ustr.gov/sites/default/files/2018_Notorious_Markets_List.pdf [last accessed

20-023DBa

on February 23, 2021].

73.     Upon information and belief, Defendants DOES 1-100 went to a torrent site directly or indirectly to upload and download Plaintiffs' copyrighted Works.

74.     Upon information and belief, Defendants DOES 1-100 went to the torrent site Pirate Bay directly or indirectly to download Plaintiffs' copyrighted Works.

75.     By using a BitTorrent Client such as Popcorn Time, Defendants DOES 1-100 can simply enter words associated with a motion picture to automatically generate a pull down tab below the search bar with a narrowed selection of motion pictures associated with the words and chose one particular motion picture and automatically connect to torrent sites.

### 4. Uploading and Downloading a Work Through a BitTorrent Swarm

76.     Once the initial seeder has created a torrent and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file to which the torrent is linked (here the copyrighted Works) using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers.

77.     The BitTorrent protocol causes the initial seeder's computer to send different pieces of the computer file, here the copyrighted Work, to the peers seeking to download the computer file.

78.     Once a peer receives a piece of the computer file, here a piece of the

17

20-023DBa

copyrighted Work, it starts transmitting that piece to the other peers.

79.    In this way, all of the peers and seeders are working together in what is called a "swarm."

80.    Here, Defendants DOES 1-100 participated in the same swarm and directly interacted and communicated with other members of that swarm through digital handshakes, the passing along of computer instructions, uploading and downloading, and by other types of transmissions.

81.    In this way, and by way of example only, one initial seeder can create a torrent that breaks a movie up into hundreds or thousands of pieces saved in the form of a computer file, like the Works here, upload the torrent onto a torrent site, and deliver a different piece of the copyrighted Work to each of the peers. The recipient peers then automatically begin delivering the piece they just received to the other peers in the same swarm.

82.    Once a peer has downloaded the full file, the BitTorrent Client reassembles the pieces and the peer is able to view the movie. Also, once a peer has downloaded the full file, that peer becomes known as "an additional seed," because it continues to distribute the torrent file, here the copyrighted Work.

*5. The Plaintiffs' Computer Investigator Identified the Defendants' IP Address as Participants in a Swarm That Was Distributing the Plaintiffs' Copyrighted Works*

20-023DBa

83.    The Plaintiffs retained Maverickeye UG ("MEU") to identify the IP addresses that are being used by those people that are using the BitTorrent protocol and the Internet to reproduce, distribute, display or perform the Plaintiffs' copyrighted Works.

84.    MEU used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions.

85.    MEU extracted the resulting data emanating from the investigation, reviewed the evidence logs, and isolated the transactions and the IP addresses associated therewith for the files identified by the SHA-1 hash value of the Unique Hash Number.

86.    The IP addresses, Unique Hash Number, and hit dates contained on Exhibit "2" accurately reflect what is contained in the evidence logs, and show that Defendants DOES 1-100 have copied at least a piece of the Plaintiffs' copyrighted Works *Automata*, *Hunter Killer*, *I Feel Pretty* and *Shock and Awe* as identified by the Unique Hash Number from IP address 108.61.128.241.

87.    The Defendants DOES 1-100' computers used the identified IP address to connect to the investigative server from a computer in this District in order to transmit a full copy, or a portion thereof, of a digital media file identified by the Unique Hash Number.

88.    MEU's agent analyzed each BitTorrent "piece" distributed by the IP

19

addresses listed on Exhibit "2" and verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Work.

89.     MEU's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar.

### *C. Defendants DOES 1-100 knew the Copyright Management Information included in the files they distributed to other peers had been removed or altered without the authority of Plaintiffs.*

90.     A legitimate file copy of the Work includes copyright management information ("CMI") indicating the title.

91.     The initial seeders of the infringing file copies of Plaintiffs' Works added wording to the file titles *Hunter Killer*, *I Feel Pretty*, and *Shock and Awe* to "brand" the quality of piracy files he or she released and attract further traffic to his or her website.

92.     The initial seeder of the infringing file copies of the Works *Hunter Killer* and *Shock and Awe* added the wording "FGT" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the RARBG website.

93.     The word FGT is not included in the file title of legitimate copies or streams of the Works *Hunter Killer* and *Shock and Awe*.  The initial seeder of the

20-023DBa

Work altered the title to falsely include the words "FGT" in the CMI.

94.     The initial seeder of the infringing file copies of the Work *I Feel Pretty* added the wording "YTS" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the YTS website.

95.     The word YTS is not included in the file title of legitimate copies or streams of the Voltage's Work *I Feel Pretty*.  The initial seeder of the Work altered the title to falsely include the words "YTS" in the CMI.

96.     The file copies Defendants DOES 1-100 distributed to other peers in the Swarm included the altered CMI in the file title.

97.     Defendants DOES 1-100 knew that the website or BitTorrent Client from which they obtained their torrent files was distributing illegal copies of the Work.

98.     Defendants DOES 1-100 knew that YTS or FGT was not the author of Plaintiffs' Works.

99.     Defendants DOES 1-100 knew that YTS or FGT was not a licensed distributor of Plaintiffs' Works.  Indeed, the YTS website includes a warning to this effect.

100.    Defendants DOES 1-100 knew that the CMI that included YTS and FGT in the file names was false.

101.    Defendants DOES 1-100 knew that the false or altered CMI in the titles

would induce, enable, facility or conceal infringements of the Work when they distributed the false CMI, altered CMI or the Work including the false or altered CMI.

102.   Namely, Defendants DOES 1-100 knew that other recipients would see the file titles and use the altered CMI to go to the website such as YTS from where the torrent files originated to obtained unlicensed copies of the Work.

103.   By providing the altered CMI to others, Defendants DOES 1-100 induced, enabled and facilitated further infringements of the Work.

**D.   The LiquidVPN Defendants had knowledge that their subscribers were infringing Plaintiffs' Works and distributing file copies of the Works with altered CMI but continued to provide LiquidVPN service to their subscribers**

104.   Plaintiffs engaged MEU to generate Notices of infringements ("Notices") styled per 17 U.S.C. §512(c)(3) of the DMCA to be sent to ISPs of IP addresses where MEU confirmed infringement of copyright protected content.

105.   Each Notice included at least the name of the copyright owner, the title of the Work, the manner by which it was infringed, the infringing file name which includes the altered CMI, the IP address and port number at where infringement was confirmed and the time of infringement down to the second. *See* Exhibit "3" (excerpt below).

20-023DBa

Protocol: BITTORRENT
Infringed Work: I Feel Pretty
Infringing FileName: I Feel Pretty (2018) [BluRay] [1080p] [YTS.AM] Infringing FileSize: 1895499662
Infringer's IP Address: 108.61.128.241 Infringer's Port: 61561 Initial Infringement Timestamp: 2019-05-17 13:43:08

106.   MEU determines the proper abuse contact email address for the ISP assigned the IP addresses at issue from publicly available information from ARIN.

107.   Plaintiffs' agent sends the Notice to the abuse contact email address.

108.   MEU relied on publicly available information from ARIN to identify non-party Choopa as the ISP for certain IP addresses at issue.

109.   Plaintiffs' agent sent Notices to Choopa concerning IP addresses associated with confirmed infringing activity.

110.   Plaintiffs' agent sent over 50 Notices to Choopa concerning just IP address 108.61.128.241 between October of 2018 and April of 2019 ("time period").

111.   During this time period, Choopa had allocated IP address 108.61.128.241 to Reliable.

112.   During this time period, Reliable had allocated IP address 108.61.128.241 to the LiquidVPN Defendants.

113.   During this time period, Choopa forwarded Notices sent by Plaintiffs to its customers, including Reliable.

114.   During this time period, Reliable forwarded Notices it received from Choopa concerning IP address 108.61.128.241 to the LiquidVPN Defendants, particularly Cox.

20-023DBa

115.   Upon information and belief, other rightsholders had similar Notices sent to Choopa concerning infringing activity at IP addresses controlled by the LiquidVPN Defendants that the LiquidVPN Defendants indeed received.

116.   For example, Home Box Office, Inc. ("HBO") sent a Notice to Choopa concerning infringing activity at IP address 108.61.128.206 controlled by the LiquidVPN Defendants on April 11, 2014 that was received by SMR and Cox.

117.   Upon information and belief, other rightsholders had similar Notices sent to non-parties such as HugeServer concerning infringing activity at IP addresses controlled by Defendants SMR and Cox that they received.

118.   For example, other rightsholders sent Notices to HugeServer concerning infringements of their Works at IP addresses 199.241.145.134 and 199.244.119.101 in 2015 that were received by Defendants SMR and Cox.

119.   The LiquidVPN Defendants continued to provide the LiquidVPN service to their subscribers despite knowledge that their subscribers were using the service to pirate copyright protected Works including Plaintiffs' exactly as promoted, encouraged and instructed by the LiquidVPN Defendants.

### E.   The LiquidVPN Defendants intentionally induce infringements of copyright protected Works, including Plaintiffs' Works.

120.   The LiquidVPN Defendants actively promote their LiquidVPN service for the purpose of movie piracy, including of infringing Plaintiffs' Works.

20-023DBa

121.   The LiquidVPN Defendants' website includes a statement that their VPN service is the "Best VPN for Torrenting and P2P Filesharing today" over the image of the notorious movie piracy website Pirate Bay. *See* https://www.liquidvpn.com/best-vpn-for-torrenting/ [last accessed on Feb. 23, 2021] (excerpt below).



122.   The LiquidVPN Defendants state their LiquidVPN service can be used to "Watch Popcorn Time without being detected by your ISP and P2P tracking software". *See* https://www.liquidvpn.com/popcorn-time-vpn/ [last accessed on Feb. 23, 2021]. (excerpt below).



123.   The LiquidVPN Defendants further state, "Experience everything Popcorn Time has to offer in the United States and the UK. Except the risks", "Stream Content Anonymously. Why bother risking complaints from your ISP, settlement demands, threats and jail time for streaming your favorite TV show."  Id.



20-023DBa

124.    Defendants include a screenshot of Popcorn Time operating on a mobile device that includes the movie art of Millennium's Work *Survivor* among other copyright protected titles. *See* Id.



 *Magnified Version showing "Survivor*

125.   Plaintiffs' investigator confirmed that Popcorn Time can be used to download, reproduce, and distribute copies of the Works *Survivor*, *Automata, I Feel Pretty* and *Shock and Awe* exactly as promoted and encouraged by the LiquidVPN Defendants.



126.   The LiquidVPN Defendant's subscribers such as DOES 1-100 use said movie piracy apps exactly as explained and encouraged to them by the LiquidVPN Defendants – to infringe copyright protected content while logged into the LiquidVPN service so they can conceal their illicit activities.

127.   The LiquidVPN Defendants' subscribers use LiquidVPN to "…watch Popcorn Time without being detected by [their] ISP and P2P tracking software [such as Plaintiffs]", to "Experience everything Popcorn Time has to offer in the United States … Except the risks", and "Stream Content Anonymously" while not risking…complaints from your ISP, settlement demands, threats and jail time for streaming your favorite TV show" exactly as encouraged to by the LiquidVPN

20-023DBa

Defendants.

128.   The LiquidVPN Defendants even blatantly promote their service to be used to stream copyright law in violation of criminal laws and encourage their users to do so.



129.   The LiquidVPN defendants entice subscribers to purchase their LiquidVPN service by promoting their LiquidVPN service as a tool to engage in massive copyright infringement.

130.   Based upon the Liquid VPN Defendants' encouragement that the LiquidVPN can be used to "safely" operate piracy apps such as Popcorn Time and visit torrent sites such as Pirate Bay, Kickass Torrents and Extratorrents, subscribers such as Defendants DOES 1-100 purchase the LiquidVPN servioce, install piracy apps such as Popcorn Time on their devices and/or visit torrent sites to infringe copyright protected content including Plaintiffs' while using the LiquidVPN service.

20-023DBa



131. In a Frequently Asked Questions section of the LiquidVPN Defendants' website, in response to the question "Can I use BitTorrent and P2P", the LiquidVPN Defendants say affirmatively "Yes" and point out they "…will never censor P2P or BitTorrent…".

> Yes, LiquidVPN fully supports bittorrent and P2P on all of our servers. We will never censor P2P or BitTorrent on any of our servers. In fact, we have pulled out of locations because they did not like our policies on P2P and bit torrent. If you would like to verify LiquidVPN is working by checking your bit torrent IP head over to https://cryptoip.info/check-torrent-ip-address and run a test

132. Upon information and belief, the LiquidVPN Defendants paid the operators of websites that hold themselves out as "neutral" evaluations of VPN services for positive evaluations

133. Defendants DOES 1-100 installed Popcorn Time on their device so they

31

could watch content in violation of copyright laws (i.e., "free movies").

134.   Defendants DOES 1-100 obtained an IP address from the LiquidVPN Defendants via the LiquidVPN service, and used the IP address to download and share copies of copyright protected content including Plaintiffs by using Popcorn Time as instructed by the LiquidVPN Defendants while concealing their identity.

135.   The LiquidVPN Defendants knew or had reason to know that their subscribers used Popcorn Time exactly as promoted by them would result in direct infringement of the Copyrights of specific material including Plaintiffs'.

**F.  The LiquidVPN Defendants control the conduct of their subscribers.**

136.   The LiquidVPN Defendants can terminate their subscriber accounts at any time.

137.   Upon information and belief, the LiquidVPN Defendants promptly terminated subscriber accounts when said subscribers failed to pay for the LiquidVPN service.

138.   The LiquidVPN Defendants have the capability to log their subscribers' access to the LiquidVPN service but purposefully choose not to.

139.   Indeed, the LiquidVPN Defendants make clear that they will log a subscriber's activities if they believe these activities are negatively impacting the performance of their network. In such cases, the LiquidVPN Defendants store: Login/logout Timestamps; Remote IP; Username; and Local IP.

20-023DBa

**G.  The LiquidVPN Defendants profit from the massive piracy conducted by their subscribers.**

140.   The LiquidVPN Defendants encourage their subscribers to use their LiquidVPN service for piracy.

141.   The LiquidVPN Defendants even market particular products to assist their subscribers in engaging in piracy anonymously.

142.   The LiquidVPN Defendants state that "If you follow our directions this VPN kill switch will never give your real IP away."  *See* https://www.liquidvpn.com/vpn-kill-switches/ [last accessed on Feb. 26, 2021].

143.   The LiquidVPN Defendants pay affiliates operating websites evaluating VPN services to give them a positive evaluation and recommend their service for piracy.

144.   For example, on the BESTVPN website https://bestvpn.org/liquidvpn-review/, the author gave the LiquidVPN service a review of 3.5/5 stars.

145.   In the review, the author stated that "With the Liquid Lock enabled, torrenting is protected from an occasional connection drop".  The Liquid Lock is identified as the name of the LiquidVPN VPN kill switch.

146.   In the review, the author noted that "P2P is allowed, in case you were wondering" and "provider openly supports P2P".

147.   The author of the article never states that his website BESTVPN is one

among dozens of paid affiliates of the LiquidVPN Defendants.

148.   The LiquidVPN Defendants recommend their Public IP VPN Topology for "P2P downloading".   *See*  https://www.liquidvpn.com/supported-vpn-tunnel/ [last accessed on Feb. 26, 2021].

149.   The LiquidVPN Defendants state, "Once you buy VPN service from LiquidVPN our network becomes your network. Use it as much as you like. Here are some highlights – We do not limit Bittorrent or P2P." *See* https://www.liquidvpn.com/buy-vpn-service/ [last accessed on Feb. 26, 2021].

**H.  The LiquidVPN Defendants do not have a safe harbor from liability.**

150.   As part of the DMCA, Congress created a safe harbor that limits the liability of ISPs for copyright infringement when their involvement is limited to, among other things, "transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(a). To benefit from this safe harbor, however, an ISP must demonstrate that it "has adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers . . . who are repeat infringers." 17 U.S.C. § 512(i)(1)(A)

151.  The LiquidVPN Defendants have failed to terminate any repeat infringers and/or take any meaningful actions against their subscribers in response to these Notices consistent with a reasonably implemented policy ("policy") for

34

termination of subscribers and account holders of the service provider's system or network who are repeat infringers necessary to support a safe harbor from liability.

152.   The LiquidVPN Defendants' refusal to terminate the accounts of subscribers using IP address 108.61.128.241 or take any action is illustrative of Defendants' lack of any meaningful action consistent with the policy.

153.   MEU confirmed over 2750 instances of distribution of Plaintiffs' Works and those of non-parties such as *Queen of the Desert* and *Beyond the Edge* at just 108.61.128.241 between the time period.

154.   Upon information and belief, Defendants failed to forward any Notices it received from any rightsholders to its subscribers.

155.   The LiquidVPN Defendants do not have a policy of terminating repeat infringers.

156.   The LiquidVPN Defendants even promote the fact that their LiquidVPN is a "DMCA Free Zone" as a positive aspect that makes them stand out from competing VPN providers.  *See* https://www.liquidvpn.com/best-vpn-for-torrenting/ [last accessed on Feb. 23, 2021] (screenshot below).



20-023DBa

157.   The LiquidVPN Defendants brag that they take no action in response to Notices from copyright holders.  *See*  https://my.liquidvpn.com/knowledgebase [last accessed on Feb. 23, 2021].

158.   Defendant Cox and his alter ego SMR proudly show a Notice of Infringement received from HBO concerning infringement of the series *Game of Thrones* at IP addresses 199.244.119.101 and 199.244.119.103, and state on the bottom in red letters "No Action Taken".  *See* https://my.liquidvpn.com/knowledgebase/487/California---Notice-of-Claimed-Infringement-Case-8-Cases.html [last accessed on Feb. 23, 2021]



159.   Defendant Cox and his alter ego SMR proudly dismissed over 100 Notices of Infringement received in April of 2015 from an adult movie provider concerning infringement of its Work at IP address 199.241.145.134 as "More Abusive DMCA reports from a single file." https://my.liquidvpn.com/knowledgebase/544/California---106-Notices-of-Claimed-Infringements-May-11.html [last accessed on Feb. 23, 2021]



160.   In a Frequently Asked Questions section of the LiquidVPN Defendants' website, in response to the question "Can I use BitTorrent and P2P?", the LiquidVPN Defendants say affirmatively "Yes" and point out they "…will never censor P2P or BitTorrent…".

161.   The LiquidVPN Defendants have failed to designate and register an agent with the Copyright Office as provided by 17 U.S.C. § 512(c)(2) during the time period and including up to now.

162.   The LiquidVPN Defendants' conduct renders them ineligible for safe harbor immunity from copyright liability under the DMCA.

**I.  Cox is individually liable for SMR's conduct.**

163.   Upon information and belief, Cox's infringing conduct included, among other things, formulating and implementing the business policies,

procedures, and practices that provide repeat infringers with continued internet service through LiquidVPN, without consequence. Because Cox directed SMR's copyright policies, Cox is equally liable for SMR's failure to comply with its legal responsibilities and for the copyright infringement that resulted from those failures.

164.   Cox was the sole shareholder and owner in the Wyoming corporation LiquidVPN, Inc.

165.   LiquidVPN, Inc. was dissolved in 2018.

166.   Cox continues to publicly hold the dissolved corporation LiquidVPN, Inc. as the owner and operator of the LiquidVPN service despite LiquidVPN, Inc. being dissolved.

167.   Cox held the dissolved corporation LiquidVPN, Inc. as the owner and operator of the LiquidVPN service despite LiquidVPN, Inc. being dissolved on the LiquidVPN website.



## VI. FIRST CLAIM FOR RELIEF

### (Direct Copyright Infringement against Defendants DOES 1-100)

168.   Plaintiffs re-alleges and incorporates by reference the allegations contained in each of the foregoing paragraphs.

169.   Plaintiffs are the copyright owners of the Works *Automata*, *Hunter Killer*, *I Feel Pretty* and *Shock and Awe* which each contains an original work of authorship.

170.   Defendants DOES 1-100 copied the constituent elements of these copyright protected Works.

20-023DBa

171.   By participating in the BitTorrent swarms with others, Defendants DOES 1-100 distributed at least a piece of each of the copyright protected Works *Automata*, *Hunter Killer*, *I Feel Pretty* and *Shock and Awe* to others.

172.   Plaintiffs did not authorize, permit, or provide consent to Defendants DOES 1-100 to copy, reproduce, distribute or display their Works.

173.   As a result of the foregoing, Defendants DOES 1-100 violated the Plaintiffs' exclusive right to reproduce the Works in copies, in violation of 17 U.S.C. §§ 106(1) and 501.

174.   As a result of the foregoing, Defendants DOES 1-100 violated the Plaintiffs' exclusive right to distribute copies of the Work in copies, in violation of 17 U.S.C. §§ 106(3) and 501.

175.   Defendants DOES 1-100's infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

176.   The Plaintiffs have suffered damages that were proximately caused by the Defendant DOES 1-100's copyright infringement including, but not limited to lost sales, price erosion, and a diminution of the value of its copyright.

## VII. SECOND CLAIM FOR RELIEF

## (Contributory Copyright Infringement by Intentional Inducement against the Liquid VPN Defendants)

177.   Plaintiffs re-allege and incorporate by reference the allegations

contained in each of the foregoing paragraphs.

178.   The LiquidVPN Defendants intentionally induced the infringement of Plaintiffs' exclusive rights under the Copyright Act, including infringement of Plaintiffs' exclusive right to reproduce, publicly perform and distribute copies of the Copyrighted Works *Automata*, *Survivor*, *Hunter Killer*, *I Feel Pretty,* and *Shock and Awe*.

179.   As instructed and encouraged by the LiquidVPN Defendants, their subscribers such as Defendants DOES 1-100 install the piracy app Popcorn Time on their devices while assigned IP addresses by the LiquidVPN services to conceal their identities.

180.   The LiquidVPN Defendants' subscribers use Popcorn Time to connect to sources that publicly perform and/or distribute copies of Plaintiffs' Copyrighted Works while they use the LiquidVPN service exactly as encouraged by the LiquidVPN Defendants.

181.   The LiquidVPN Defendants induce direct infringement of Plaintiffs' Works by encouraging their subscribers to use movie piracy apps such as Popcorn Time that facilitate, enable, and create direct links between  their customers and infringing sources, and by actively inducing, encouraging and promoting their LiquidVPN service as a means to "safely" use movie piracy applications for blatant copyright infringement by assuring customers that their identification information

20-023DBa

will be concealed by the LiquidVPN service.

182.   The LiquidVPN Defendant' intentional inducement of the infringement of Plaintiffs' rights in their Copyrighted Works constitutes a separate and distinct act of infringement.

## VIII. THIRD CLAIM FOR RELIEF

### (Contributory Copyright Infringement based upon Material Contribution against all Defendants)

183.   Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

184.   By participating in the BitTorrent swarms with others, Defendants DOES 1-100 induced, caused or materially contributed to the infringing conduct of the copyright protected Work *Automata*, *Hunter Killer*, *I Feel Pretty,* and *Shock and Awe* by others.

185.   Plaintiffs did not authorize, permit, or provide consent to the Defendants inducing, causing, or materially contributing to the infringing conduct of others.

186.   Defendants DOES 1-100 knew or should have known that the other BitTorrent users in a swarm with them were directly infringing the Plaintiffs' copyrighted Works by copying constituent elements of the registered Works that are original.   Indeed, Defendants DOES 1-100 directly participated in and therefore materially contributed to others' infringing activities.

20-023DBa

187.   Through its conduct, the LiquidVPN Defendants knowingly and intentionally induced, enticed, persuaded, and caused its subscribers to infringe Plaintiffs' Copyrighted Works *Automata*, *Survivor*, *Hunter Killer*, *I Feel Pretty*, and *Shock and Awe*, and continue to do so in violation of Plaintiffs' copyrights.

188.   Through its activities, the LiquidVPN Defendants knowingly and intentionally take steps that are substantially certain to result in direct infringement of Plaintiffs' Copyrighted Works, and that have resulted in such direct infringement in violation of Plaintiffs' copyrights.

189.   Despite the LiquidVPN Defendants' knowledge that their subscribers are using their LiquidVPN service to engage in widescale copyright infringements, the LiquidVPN Defendants have failed to take reasonable steps to minimize the infringing capabilities of its service.

190.   Not only have the LiquidVPN Defendants failed to take reasonable steps to minimize the infringing capabilities of its service, the LiquidVPN Defendants actively promote their LiquidVPN service as means to "safely" infringe Copyright protected Works, including Plaintiffs' and explicitly the Work *Survivor* of Millennium.

191.   The LiquidVPN Defendants are liable as contributory copyright infringers for the infringing acts of their subscribers.  The LiquidVPN Defendants have actual and constructive knowledge of the infringing activity of their

20-023DBa

subscribers. The LiquidVPN Defendants knowingly caused and otherwise materially contributed to these unauthorized reproductions and distributions of Plaintiffs' Works.

192. The Defendants' infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

193. By engaging in the contributory infringement alleged in this Complaint, the Defendants deprived not only the producers of the Work from income that could have been derived when the respective film was shown in public theaters and offered for sale or rental, but also all persons involved in the production and marketing of this film, numerous owners of local theaters and retail outlets and their employees, and, ultimately, the local economy. The Defendants' misconduct therefore offends public policy.

## VIII. FOURTH CLAIM FOR RELIEF

### (Vicarious Infringement against the LiquidVPN Defendants)

194. Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

195. The LiquidVPN Defendants are vicariously liable for the infringing acts of their subscribers.

196. The LiquidVPN Defendants have the right and ability to supervise and control the infringing activities that occur through the use of their service, and at all

20-023DBa

relevant times has derived a direct financial benefit from the infringement of Plaintiffs' copyrights.

197. The LiquidVPN Defendants have refused to take any meaningful action to prevent the widespread infringement by their subscribers. Indeed, the ability of subscribers to use Defendants' LiquidVPN service to access notorious piracy means such as the application Popcorn Time and the website Pirate Bay to infringe Plaintiffs' Works while concealing their activities acts as a powerful draw for users of the LiquidVPN service, who use that service exactly as encouraged by the LiquidVPN Defendants to download and distribute copies of Plaintiffs' Works.

198. The LiquidVPN Defendants are therefore vicariously liable for the unauthorized reproduction, distribution, and public performance of Plaintiffs' Works.

## IX. FIFTH CLAIM FOR RELIEF

### (Digital Millennium Copyright Act Violations)

199. Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

200. The Defendants DOES 1-100 knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the copyright protected Work *I Feel Pretty* distributed copyright management information ("CMI") that falsely included the wording "YTS" or in violation of 17 U.S.C. § 1202(a)(2).

20-023DBa

201.   The Defendants DOES 1-100 knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the copyright protected Works *Hunter Killer* and *Shock and Awe* distributed copyright management information ("CMI") that falsely included the wording "FGT" in violation of 17 U.S.C. § 1202(a)(2).

202.   Defendants DOES 1-100, without the authority of Plaintiffs Millennium and Voltage or the law, distributed removed or altered CMI knowing that the CMI had been removed or altered to include the wording "YTS" or "FGT" without the authority of the Plaintiffs and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of Plaintiffs' Copyright protected Works in violation of 17 U.S.C. § 1202(b)(2).

203.   Defendants DOES 1-100, without the authority of Plaintiffs Millennium and Voltage or the law, distributed Plaintiffs' Copyright protected Works knowing that the CMI had been removed or altered to include the wording "YTS" or "FGT", and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of the copyright protected Works in violation of 17 U.S.C. § 1202(b)(3).

204.   Particularly, the Defendants DOES 1-100 knew that the CMI in the file names of the pieces of the Work had been altered to include the wording "YTS" or "FGT".

205.   Particularly, the Defendants DOES 1-100 distributed the file names that

20-023DBa

included CMI that had been altered to include the wording "YTS" or "FGT".

206.   Defendants DOES 1-100 knew that the wording "YTS" or "FGT" originated from notorious movie piracy website.

207.   Defendants DOES 1-100's acts constitute violations under the Digital Millennium Copyright Act ("DMCA violation"), 17 U.S.C. § 1202.

208.   Through its conduct, the LiquidVPN Defendants knowingly and intentionally induced, enticed, persuaded, and caused its subscribers to constitute DMCA violations.

209.   Through its activities, the LiquidVPN Defendants knowingly and intentionally take or took steps that are substantially certain to result in their subscribers committing DMCA violations, and that have resulted in DMCA violations.

210.   The LiquidVPN Defendants encourage their subscribers to access torrent files for copying copyright protected Works from notorious movie piracy websites such as The Pirate Bay.

211.   Despite the LiquidVPN Defendants' knowledge that their subscribers use the LiquidVPN service to commit DMCA violations, the LiquidVPN Defendants have failed to take reasonable steps to minimize the capabilities of its service to facilitate DMCA violation.

212.   The LiquidVPN Defendants are secondarily liable for the DMCA

violations of their subscribers.   The LiquidVPN Defendants have actual and constructive knowledge of their subscribers' DMCA violations.   The LiquidVPN Defendants knowingly caused and otherwise materially contributed to these DMCA violations.

213.   The LiquidVPN Defendants are vicariously liable for the DMCA violations of its subscribers. The LiquidVPN Defendants have the right and ability to supervise and control the DMCA violatiosn that occur through the use of tehir service, and at all relevant times have derived a direct financial benefit from the DMCA violations complained of herein. The LiquidVPN Defendants have refused to take any meaningful action to prevent the widespread DMCA violations by their subscribers. Indeed, the ability of subscribers to access torrent website such as the Pirate Bay that the LiquidVPN Defendants themselves promote and obtain file copies of the Works with altered CMI and distribute said copies while concealing their activities acts as a powerful draw for users of the LiquidVPN service, who use that service exactly as encouraged by the LiquidVPN Defendants to commit DMCA violations. The LiquidVPN Defendants are therefore vicariously liable for the DMCA violations.

214.   Plaintiffs are entitled to an injunction to prevent Defendants from engaging in and/or contributing to further violations of 17 U.S.C. § 1202.

215.   Plaintiff is entitled to recover from Defendants the actual damages

suffered by Plaintiffs and any profits Defendants have obtained as a result of their wrongful acts that are not taken into account in computing the actual damages. Plaintiffs are currently unable to ascertain the full extent of the profits Defendants have realized by their violations of 17 U.S.C. § 1202.

216.   Plaintiffs are entitled to elect to recover from Defendants statutory damages for their violations of 17 U.S.C. § 1202.

217.   Plaintiffs are further entitled to costs and reasonable attorneys' fees.

## VI.  SIXTH CLAIM FOR RELIE

**(Application for Injunctive Relief based upon Contributory Infringement)**

218.   Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

219.   The LiquidVPN Defendants had actual knowledge of their subscribers' infringements of Plaintiffs' exclusive rights under the Copyright Act by accessing notorious piracy websites that are of foreign origin. Indeed, the LiquidVPN Defendants promote some of these notorious piracy websites such as the Pirate Bay.

220.   Despite having said actual knowledge, the LiquidVPN Defendants haves continued to provide Internet service to their subscribers through the LiquidVPN service.

221.   The LiquidVPN Defendants' actions of providing transmission, routing, or connections for said copies of the Works to their users are a direct and

49

proximate cause of the infringements of Plaintiffs' Works.

222.   The LiquidVPN Defendants had actual or constructive knowledge of infringement of Plaintiffs' exclusive rights under the Copyright Act by its users.  The LiquidVPN Defendants knowingly and materially contributed to such infringing activity.

223.   As a direct and proximate result of the infringement to which the Liquid VPN Defendants knowingly and materially contribute, Plaintiffs are entitled to injunctive or other equitable relief as provided by 17 U.S.C. §§ 512(j)(1)(A) and (B) including but not limited to an order restraining the Liquid VPN Defendants from providing access to infringing material or activity residing at movie piracy websites including but not limited to: (a) YTS; (b) Piratebay; (c) Rarbg; (d) 1337x; (e) Fmovies; (f) Cimaclub; (g) Phinmoi; (h) Rapidgator; (i) Rutracker; (j) Torrentz2; (k) Uploaded; and (l) VK and/or taking reasonable steps to block access to said movie piracy websites on all servers and/or networks under their control.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully requests that this Court:

(A) permanently enjoin Defendants DOES 1-100 from continuing to infringe the Plaintiffs' copyrighted Works;

(B) permanently enjoin the LiquidVPN Defendants from contributing to infringement of Plaintiffs' Works by promoting and encouraging their subscribers

20-023DBa

to use the LiquidVPN service as a means to conceal use of software application Popcorn Time and movie piracy websites such as the Pirate Bay for pirating Plaintiffs' Works.

(C) permanently enjoin the LiquidVPN Defendants from contributing to infringement of Plaintiffs' Works by promoting and encouraging their subscribers to use the LiquidVPN service to use the software application Popcorn Time and access movie piracy websites, and particularly order the LiquidVPN Defendants to immediately remove the title art of Millennium's Work *Survivor* from their website.

(D) order the LiquidVPN Defendants to block subscribers from accessing notorious piracy websites of foreign origin that are listed in the annual trade report of Notorious Foreign Markets published by the United States Government on their LiquidVPN service and any other networks under their control.

(E) order the LiquidVPN Defendants to adopt a policy that provides for the prompt termination of subscribers that engage in repeat infringements of copyright protected Works.

(F) order the LiquidVPN Defendants to block ports 6881-6889 on all of the servers and/or networks under their control to prevent further pirating of Plaintiffs' Works via the BitTorrent protocol.

(G) award the Plaintiffs actual damages and Defendants' profits in such amount as may be found; alternatively, at Plaintiffs' election, for maximum

20-023DBa

statutory damages of $150,000/Work pursuant to 17 U.S.C.  § 504-(a) and (c) against (i) each of Defendant DOES 1-100; and (ii) against the LiquidVPN Defendants jointly and severally;

(H) award the Plaintiffs their actual damages from the DMCA violations and Defendants' profits in such amount as may be found; or, in the alternative, at Plaintiff's election, for maximum statutory damages of $25,000 for DMCA violations pursuant to 17 U.S.C. § 1203(c) for violations of 17 U.S.C. § 1202 against (i) each of Defendant DOES 1-100; and (ii) against the LiquidVPN Defendants jointly and severally;

(I) award the Plaintiffs their reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505 against Defendants; and

(J) grant the Plaintiffs any and all other and further relief that this Court deems just and proper.

The Plaintiffs hereby demand a trial by jury on all issues properly triable by jury.

DATED: Kailua-Kona, Hawaii, March 2, 2021.

CULPEPPER IP, LLLC

 /s/ Kerry S. Culpepper
Kerry S. Culpepper
Hawaii Bar No. 9837
CULPEPPER IP, LLLC
75-170 Hualalai Road, Suite B204

Kailua-Kona, Hawai'i 96740
Telephone:   (808) 464-4047
kculpepper@culpepperip.com

20-023DBa